UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———

RONALD ANTHONY THURMOND,　　　)
#358224,　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　Petitioner,　　)　　　Case No. 1:06-cv-580
　　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　　)　　　Honorable Janet T. Neff
　　　　　　　　　　　　　　　　　)
KENNETH McKEE,　　　　　　　　　)
　　　　　　　　　　　　　　　　　)　　　**REPORT AND RECOMMENDATION**
　　　　　　　　　　　Respondent.　　)
_____)

　　　　　　This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254.  On October 18, 2000, petitioner was convicted in St. Joseph County Circuit Court on charges of first-degree criminal sexual conduct, MICH. COMP. LAWS § 750.520b(1); assault with intent to do great bodily harm less than murder, MICH. COMP. LAWS § 750.84; and possession of a firearm during the commission of a felony, MICH. COMP. LAWS 750.227b.  The court sentenced petitioner to 45-years-to-life on the first-degree CSC conviction, 80-months-to-10 years for assault with intent to do great bodily harm; and a consecutive two-year term for his felony firearm conviction.  The Michigan Court of Appeals summarized the actions by petitioner giving rise to these criminal convictions as follows:

　　　　　　Defendant, in an apparent jealous rage, assaulted and tortured the victim, his live-in girlfriend, who was eight months pregnant with twins.  After retrieving the victim and the couple's one-year-old daughter from a relative's residence, defendant first threatened to kill the victim as they drove home in his truck.  Defendant reached for a crow bar and held it in a manner that indicated he was about to strike the victim.  The victim fled from the vehicle and dove into an icy cold river to escape him.  Defendant initially threatened the victim, then promised that he would not harm her

if she returned to the truck. The victim complied.  However, upon arriving at their trailer, defendant forced the victim to take off her clothes and put her hands behind her back as he repeatedly struck her in the chest and face with his hands.  Defendant put a loaded rifle to the victim's temple and burned her body severely and repeatedly using cigarettes and a stove grate. Defendant also sexually assaulted the victim while the barrel of the rifle lay next to her head. After the sexual assault, defendant forced the victim to go outside and relieve herself in the dirt.  Defendant would not allow the victim to return to the camper.  Instead, he forced her to sit naked on top of his vehicle in the freezing rain, threatening to shoot her if she moved.  Defendant eventually allowed the victim to return to the trailer, and he went to sleep.

The next day, defendant left the home, and the victim's sister came to the trailer.  Upon observing the victim's injuries, she persuaded the victim to go to police.  On the way to the police station, the victim was upset when she saw defendant pursuing them.  When they were close to the police station, defendant quit the chase.  A female officer who photographed the victim's injuries advised the investigating officer that hospitalization was necessary for the extensive burns on the victim's body.  The victim refused to seek medical treatment, fearing that she would encounter defendant at the hospital.  She agreed to seek medical treatment when police promised to accompany her to the hospital.  At the hospital, it was learned that the victim had suffered "full thickness burns," burns that extended below the surface into the underlying fat layer.  The numerous burns ranged in degree of severity, and the majority of the burns were to the victim's buttocks and thigh.  The burns likely occurred within twenty-four hours of the victim's presentation at the hospital.  Police escorted the victim to her sister's residence when defendant was seen in the area. Police left the victim to pursue and arrest defendant.

Defendant denied any assault or torture of the victim.  He testified that he would not have harmed the victim because of her pregnancy, despite the fact that he did not know if she was carrying his child.  Defendant's relatives and friends testified that they saw defendant and the victim the night before his arrest when they were drinking together.  However, they could not provide an alibi for the entire evening. The trial court convicted defendant as charged and found substantial and compelling reasons to exceed the legislative sentencing guidelines, citing to the extreme brutality of the crime, the need to protect society, and defendant's age.

On August 14, 2006, petitioner filed his federal habeas corpus petition.  (docket # 1)  The *pro se*

petition asserts the following grounds:

1.   The trial court violated petitioner's due process rights by convicting him on erroneous findings of fact;

-2-

2.      The trial court violated petitioner's due process rights by departing upwards from Michigan's sentencing guidelines;

3.      The trial court abused its discretion and violated petitioner's due process rights when it failed to review petitioner's claim of newly discovered evidence and summarily dismissed petitioner's 6.500 motion;

4.      The Due Process Clause requires a new trial or an evidentiary hearing when petitioner received new information which affects the validity of his bench trial and jury waiver;

5.      Petitioner is entitled to relief from judgment where the irregularity was so offensive to the maintenance of a sound judicial system;

6.      The trial court's sentencing departure violated petitioner's due process rights under *Blakely v. Washington*, 542 U.S. 296 (2004); and

7.      The Michigan Court of Appeals erred in failing to remand petitioner's case for an evidentiary hearing based on petitioner's claim of newly discovered evidence.

Respondent's answer (docket # 16) asserts that ground 1 of the petition is without merit, ground 2 objecting to the scoring under Michigan's sentencing guidelines fails to state grounds for federal habeas corpus relief, and that all the remaining grounds raised in the petition are barred by petitioner's procedural default. Upon review, I find that all grounds for relief are meritless, and that it is unnecessary to reach the issue of procedural default. Accordingly, I recommend that the petition be denied on its merits.

## **Proposed Findings of Fact**

### **1.    Trial Proceedings**

Jury selection for petitioner's trial began on October 3, 2000. (Jury Selection Transcript (JST), docket # 29). After a jury had been selected, petitioner volunteered to have a bench trial before Judge Noecker. Judge Noecker carefully advised petitioner that he had an absolute right

to a jury trial and that he would be giving up that right if he agreed to a bench trial.  The court recessed to provide petitioner with an opportunity to confer with his counsel regarding petitioner's decision to proceed with a bench trial.  When court proceedings resumed, petitioner expressly waived his right to a jury trial and agreed to proceed in a bench trial before Judge Noecker.  (JST, 56-63).

The prosecution called six witnesses.  The victim, Shannon Marie Lemon, testified that on November 23, 1999, she was living with petitioner in Lockport Township, St. Joseph County, Michigan.  (Trial Transcript (TT) I, docket # 30, at 15-16).  She and petitioner had been living together in a camper for about a year an a half.  (TT I, 74).  It was near a house owned by petitioner's father.  On November 23, 1999, the day of the crime, Shannon Lemon  was nine-months pregnant with twins, born at term ten days later on December 4, 1999.  Petitioner was the father.  (TT I, 21-22).

One or two days before Ms. Lemon went to the police, her sister Monique came over with her husband and persuaded Lemon to go to Monique's house.  When they arrived, petitioner was there.  (TT I, 22-24).  Petitioner got out of his truck and told Ms. Lemon to come with him to look at a house where he proposed that they live.  (TT I, 24).  Petitioner, Ms. Lemon, and her one-year-old daughter LaSha got into the truck, and petitioner began to drive towards Fisher Lake.  He began to question her about how she had received a black eye.  Petitioner was unsatisfied with Lemon's answer, and accused her of lying.  He feared that she was "thinking about escaping, going to Chicago."  (TT I, 27).  Ms. Lemon became fearful that petitioner would hit her, so she "made up a lie" because "he wanted me to say something."  (TT I, 28).  Petitioner again accused her of lying and said, "I'm just going to take you on a dirt road and kill you and get it over with."  (TT I, 28).

-4-

Petitioner drove onto a dirt road, stopped the truck, retrieved a crowbar from behind the seat, and held it as if he were going to strike Ms. Lemon. (TT I, 29). She opened the truck door and tried to run. After slipping and falling, she ran down to the water and dove in in her effort to escape. (TT I, 29-31). Petitioner told her to get out of the water before she made him come in there and get her. (TT I, 31). He assured her that he was not going to kill her and told her to get back into the truck. She did so, and petitioner drove back to the camper. (TT I, 31-32). They went inside, and petitioner told Ms. Lemon to remove her wet clothes and put her hands behind her back. He told her to stand against the closet door and began punching her in the chest. She told him to stop because it hurt. He said that if she moved her hands from behind her back again he would kick her in the stomach to make her lose her babies, "because he didn't think they were his anyway." (TT I, 33-35). He punched her in the chest again and then got a pair of pliers out of the drawer. Petitioner hit Ms. Lemon on her legs and knees with the pliers. (TT I, 35).

Petitioner lit a cigarette and began questioning Ms. Lemon. When he didn't like her answers, he burned her with a cigarette on the arm. (TT I, 36). He continued to question her, lit another cigarette, and began to burn her on the other arm and then on the legs. Ms. Lemon was begging him to stop, but petitioner "just kept burning me until he figured out he was wasting his cigarettes, and he said he was going to quit burning me because he didn't have enough money to buy another pack." (TT I, 41).

Petitioner told Ms. Lemon to sit down and then went outside. She heard the car door open and heard him putting a bullet in his gun. He questioned her again and threatened to shoot her in the leg to make her suffer. Then he put the gun (a "long gun like a hunting gun") to her head. (TT I, 42-43).

-5-

Petitioner continued questioning Ms. Lemon, accusing her of cheating on him.  He then went over to the stove and grabbed a hot stove grate with the pliers.  (TT I, 44-45).  He started burning Ms. Lemon with it, first on her arms and then her buttocks.[1]  (TT I, 46-47).  Petitioner grabbed a pillow and put Ms. Lemon's face into it as she screamed to muffle the sound.  During this time, the gun was on the bed near the complainant, where petitioner could easily reach it.  (TT I, 52-53).

Petitioner then anally raped Ms. Lemon.  After doing so, he hit and choked her until she passed out.  (TT I, 54-56).

When Ms. Lemon revived, petitioner again accused her of lying and started hitting her again.  (TT I, 56).  At that point, petitioner's cousin pulled up to the trailer.  Petitioner told her not to come out of the camper and that she "better not say nothing."  (TT I, 56-57).  After the cousin left, petitioner went back into the camper.  Ms. Lemon needed to use the bathroom, which would have required her to go to petitioner's father's house, as the facility in the camper was broken.  Petitioner refused to let her do so.  (TT I, 58-59).  He ultimately told her to go outside, while naked in the "freezing rain," and to relieve herself there.  (TT I, 59).  He then forced her to sit on the hood of the car, naked, threatening to shoot her if she moved.  (TT I, 59-60).  He ultimately let her back inside the camper, but she was afraid to sleep that night because she was in fear and pain.  (TT I, 60).

The next day, Ms. Lemon's sister Monique came to the camper while petitioner was gone.  Monique was concerned about the bruises on her face.  Monique took Lemon and her daughter to her house.  Lemon's sister and brother-in-law ultimately took her to the Three Rivers police

---

[1] During the complainant's testimony, the prosecutor admitted into evidence photographs taken at the hospital or by police the next day of her various burns and other wounds.

station.  Petitioner followed them part of the way, but turned back when they got close to the station.

A police officer took photographs of Ms. Lemon and sent her to the hospital.  (TT I, 66-71, 74).

While at the hospital, Ms. Lemon told a female officer and a nurse about the anal penetration.  (TT

I, 108, 110).

        The prosecution called Officer Mark Lillywhite of the St. Joseph County Sheriff

Department, who participated in arresting petitioner and searching the camper pursuant to a warrant.

Pursuant to the warrant, officers seized the grates on the gas range, but they were unable to find a

gun.  (TT I, 116-19).

        The prosecution called Monique R. Cottrell, the complainant's sister.  Ms. Cottrell

testified concerning the events of November 23 and 24, 1999.  She had seen her sister at about 7:00

p.m. on the evening of the 23rd, at which time Ms. Lemon looked "like herself."  (TT I, 123).  She

again saw her sister at the camper at about noon the next day, November 24.  Ms. Lemon was trying

to hide her face.  When Cottrell took a good look at her sister, she saw that her face was "all puffy"

and that she had a black ring around her eye.  She also observed that Lemon was unable to sit down

and was acting "all jumpy and scared."  (TT I, 126).  Cottrell realized that petitioner had been hitting

Lemon, but Lemon denied it.  (TT I, 127-28).  Cottrell insisted that petitioner go with her and finally

was successful in getting Lemon and her daughter into the car.  (TT I, 130-31).

        Cottrell took her sister home, where Lemon took a shower and changed clothes.

Monique and her husband then took Lemon to the police station.  On the way there, they noticed that

they were being followed by petitioner.  During this time, Lemon was showing signs of fear, crying,

ducking down under the seat, and saying, "Oh my God, oh my God."  (TT I, 132-33).

Sgt. Jim Clawson of the St. Joseph County Sheriff's Department testified concerning the execution of a search warrant on the camper on November 24, 1999, at which point officers seized three pairs of pliers. (TT I, 139-40). He also testified concerning his initial encounter with the complainant at the Three Rivers Police Department on the same day. He observed several burn marks on both arms and a black eye. He also observed that Lemon was "obviously in a lot of pain." (TT I, 141). He described her as looking like "a beaten dog . . . intimidated." (TT I, 142). Clawson called in a female officer to take pictures of the bruises and burn marks. (TT I, 143). After taking the pictures, the officer advised Clawson that Lemon needed to go to the hospital because of the severity of the burns. Lemon resisted, because she was afraid that petitioner was either outside or would be at the hospital. Officers were able to persuade her to go to the hospital by assuring her that they would stay with her the whole time. (TT I, 143-44).

Clawson arrested petitioner the same day and questioned him about the incident, after delivering *Miranda* warnings. Petitioner denied any responsibility and suggested that people in Chicago had perpetrated the crime. (TT I, 147-48). On cross-examination, Clawson testified that Lemon did not inform him of a sexual assault during his first interview of her, but that she did inform him of the anal rape at the second interview, about two hours later. (TT I, 149).

Antwain Cottrell, the complainant's brother-in-law, testified briefly concerning driving the complainant from the camper to his house, and ultimately to the hospital. (TT I, 155-63).

The prosecution's final witness was Wallace Broadbent, M.D., an emergency room physician at Three Rivers Area Hospital. (TT I, 176). Dr. Broadbent was working in the emergency room at Three Rivers Area Hospital on November 23, 1999. (TT I, 177). He observed bruises on Shannon Lemon's right cheek area, a bruise on her upper chest breast area, a bruise on the top of her

-8-

left shoulder.  (TT I, 178).  She had cigarette burns and other burns on her forearms and her buttocks area.  (TT I, 178).  The burns were of a circular pattern and were "full thickness burns," meaning that the burns extended all the way through the surface of the skin into the underlying fat area.  (TT I, 179).  She had other burns, up to third degree in severity, on her arms, buttocks, posterior back and part of her right thigh.  (TT I, 184).  Dr. Broadbent testified that the burn wounds he observed on the victim were consistent with a metal grate being heated and pressed against the victim's flesh.  (TT I, 186).  The circular burns were consistent with cigarette burns.  (TT I, 192).  Because of the depth of the burns, they posed substantial risk of great bodily harm by infection.  (TT I, 188-90).  The burns were probably about 24-hours old when the doctor first saw them.  (TT I, 193-94).  Dr. Broadbent testified that Ms. Lemon did not report a sexual assault to him.  If she had, he would have employed a sexual assault kit.  (TT I, 176-77, 196).

Defense counsel called three alibi witnesses:  petitioner's cousin Robert Hayes (TT II, 219, docket # 31), his friend Rosalyn Crump (TT II, 227), and his cousin Eric Moore (TT II, 235-36).  They all testified that they were with petitioner on the evening of November 23, 1999.  As the state Court of Appeals noted, however, they could not provide an alibi for the entire evening.

Defense counsel also called Glenn L. Moore, a forensic scientist with the Michigan Department of State Police.  Mr. Moore examined the four grates seized by police officers in an effort to find trace evidence, such as the presence of skin or tissue.  (TT II, 258-59).  He found none.  Mr. Moore also testified, however, that the burn marks depicted in photographs of the complainant's wounds were consistent with the patterns found on the grates.  He also testified that a burn from that source would not necessarily leave skin or flesh on the grate.  (TT II, 261-63).

Petitioner elected to take the witness stand in his own defense.  (TT II at 267).

Petitioner denied chasing Shannon into the river, asserting that he would never do that to a woman

carrying twins, whether or not he was the father.  (TT II, 288-89).  He denied burning her with his

cigarette.  (TT II, 290).  He denied hitting her face or burning her with a grate from the grill.  (TT

II, 290).  He denied hitting her with pliers.  (TT II, 290).  Petitioner denied penetrating Shannon

Lemon anally.  (TT II, 291).  He denied having a gun and testified that he had never observed a gun

in his camper. (TT II, 288).

On October 18, 2000, Judge Noecker found petitioner guilty on all three charges.

Judge Noecker made detailed findings, both regarding the existence of the required element of each

crime and regarding petitioner's defenses.  He flatly rejected petitioner's purported alibi, pointing

out that petitioner admittedly was alone with the victim from midnight to 6:00 a.m., more than

sufficient time to commit the charged crimes.  (Bench Op., docket # 32).

On January 19, 2001, petitioner was sentenced to two years on the felony firearm

charge, a consecutive sentence of eighty months to ten years on the assault with intent to do great

bodily harm, and 45 years to life on the first degree criminal sexual conduct conviction, to run

consecutive to the felony firearm conviction and concurrent with the assault with intent to do great

bodily harm conviction.  (Sentencing Hearing at 6, docket # 35).  The judgment entered by the court

on January 19, 2001, did not include credit for the 423 days petitioner had served in jail.

## 2.     Appellate Proceedings

Petitioner pursued an appeal as of right in the Michigan Court of Appeals.  The issues

petitioner raised on appeal were as follows:

-10-

I. DID THE TRIAL COURT VIOLATE APPELLANT'S DUE PROCESS RIGHTS BY CONVICTING APPELLANT BASED ON CLEARLY ERRONEOUS FINDINGS OF FACT?

II. DID THE TRIAL COURT VIOLATE APPELLANT'S DUE PROCESS RIGHTS BY RELYING ON SUBJECTIVE AND UNVERIFIABLE REASONS TO DEPART ABOVE THE STATUTORY SENTENCING GUIDELINES RANGE?

III. IS THE APPELLANT ENTITLED TO CLERICAL CORRECTION OF THE JUDGMENT OF SENTENCE TO INCLUDE JAIL CREDIT STATED ON THE RECORD AT SENTENCING?

(Defendant-Appellant's Brief on Appeal at v, Statement of Questions Presented, docket # 36).

On August 5, 2003, the Michigan Court of Appeals issued an unpublished, *per curiam* opinion affirming petitioner's convictions and remanding the matter to the trial court for a clerical correction awarding petitioner credit for jail time served. The Court of Appeals rejected petitioner's challenge to the trial judge's factual findings:

Defendant first contends that the trial court erred in finding that a sexual assault occurred because there was no physical evidence of the sexual assault, and the victim failed to report the sexual assault to the emergency room physician. We disagree. This Court reviews findings of fact by a judge in a criminal bench trial for clear error. *People v. Gistover*, 189 Mich.App 44, 46; 472 NW2d 27 (1991). A factual finding is clearly erroneous if, after review of the entire record, the appellate court is left with a definite and firm conviction that an error occurred. *Id.* When reviewing the trial court's factual findings, regard is given to the special opportunity of the trial court to assess the credibility of the witnesses who appear before it. *People v. Thenghkam*, 240 Mich.App 29, 44; 610 NW2d 571 (2000). Trial court credibility assessments are not reviewed anew on appeal unless the testimony is patently incredible, defies physical realities, is seriously impeached, or could not be believed by any reasonable juror. *People v. Lemmon*, 456 Mich. 625, 643-644; 576 NW2d 129 (1998). Here, we cannot conclude that the trial court's determination regarding the credibility of the sexual assault testimony was clearly erroneous. The extensive burns inflicted all over her body evidenced the torture and brutality experienced by the victim. The trial court concluded that the pain suffered as a result of the burns paled in comparison to the sexual assault, thereby accounting for the failure to report the assault to the emergency room physician. Contrary to defendant's assertion, the trial court's sexual assault finding is not illogical or clearly erroneous. *Gistover, supra.**

-11-

_____

      **\*** Defendant's challenge to the failure to locate skin on the grate used to burn the victim is also without merit.  The forensic scientist testified that skin would not necessarily adhere to the grate. Furthermore, the scientist testified that the burn patterns were consistent with application of the grate to the skin.

(Op. at 2).

      The Court of Appeals found no abuse of discretion in the trial court's decision finding that there were substantial and compelling reasons for an upward departure from Michigan's sentencing guidelines:

> Defendant next alleges that the trial court relied on subjective and invalid reasons when sentencing him to a term in excess of the legislative guidelines.  We disagree.  The trial court's determination that substantial and compelling reasons exist to depart from the recommended minimum sentence is reviewed for an abuse of discretion.  *People v. Armstrong*, 247 Mich.App 423, 424; 636 NW2d 785 (2001). The trial court may depart from the guidelines where legitimate factors have not been considered by the guidelines or where factors considered by the guidelines have been given inadequate or disproportionate weight.  *Id*. In this case, the trial court concluded that the guidelines did not contemplate the circumstances and brutality of the crimes. Under the circumstances of this case, we cannot conclude that the trial court abused its discretion.

(Op. at 3).  Petitioner filed a motion for reconsideration on August 19, 2003.  On September 18, 2003, the Michigan Court of Appeals entered an order denying petitioner's motion.  (9/18/03 Order, docket # 36).

      On November 13, 2003, petitioner filed an application for leave to appeal raising the two issues that he had unsuccessfully asserted in the Michigan Court of Appeals.  (Application for Leave to Appeal at iv, Statement of Questions Presented, docket # 37).  On March 30, 2004, the Michigan Supreme Court entered its order denying petitioner's application for leave to appeal because it "was not persuaded that the questions presented should be reviewed by this Court." (3/30/04 Order, docket # 37).

3.      **Post-Conviction Proceedings**

Petitioner filed a Rule 6.500 motion for relief from judgment in St. Joseph County Circuit Court.  The motion alleged the existence of newly discovered evidence, in the form of judicial disciplinary proceedings instituted by the Michigan Judicial Tenure Commission (JTC) on August 19, 2003, three years after petitioner's trial and conviction.[2]  The disciplinary proceedings were triggered by a driving accident occurring on March 12, 2003, in which Judge Noecker crashed his car into a building and then left the scene of the accident.  The JTC alleged that Noecker was under the influence of alcohol and lied to police to cover up his wrongdoing.  On April 30, 2004, a special hearing master appointed by the JTC issued findings that Noecker had committed misconduct.  The master found that Judge Noecker had been a self-admitted alcoholic since 1994 and had participated in several treatment programs; that his alcohol dependence had contributed to the judge's delay in completing cases and filing required reports; that he had driven a car under the influence of alcohol on March 12, 2003, causing a property damage accident and left the scene; that he had lied to officers and to the tribunal about the cause of the accident.  (Master's Report at 18-22). The master noted, however, that none of the attorney witnesses "indicated that they had ever seen or had reason to believe that Respondent had been drinking or was intoxicated while on the bench." (*Id.* at 13).  Likewise, the Circuit Court Administrator testified that Noecker informed him of his alcohol problem in the mid-1990s, but that the Administrator "has never known Respondent to drink during the work day and that he has never seen Respondent intoxicated in court."  (*Id.*).  The JTC recommended removal from office.

_____

[2] All documents pertaining to the judicial discipline, including the Supreme Court opinion, are found in the state Court of Appeals post-conviction record (docket # 38).

By opinion issued February 1, 2005, the state Supreme Court removed Judge Noecker from office. *In re Noecker*, 691 N.W.2d 440 (Mich. 2005). The opinion emphasized his dishonesty to police and in testifying before the master as justifying the sanction of removal. 691 N.W.2d at 445. The court noted Judge Noecker's "persistent docket problems," but found that they did not, standing alone, merit removal from office. *Id.* at 447.

Petitioner's motion asserted the foregoing facts created a likelihood that Judge Noecker had been drinking during petitioner's trial, thus depriving him of an impartial trier of fact and rendering his waiver of a jury trial involuntary. On March 30, 2005, Chief Circuit Judge Michael H. Cherry of the St. Joseph County Circuit Court found "[N]o merit at all in the Motion, no cause to require the Prosecution to answer, and no need for an evidentiary hearing." (3/30/05 Opinion and Order, found in Michigan Court of Appeals Record, docket # 38).

On August 22, 2005, petitioner filed a delayed application for leave to the Michigan Court of Appeals. (docket # 38). The issues petitioner raised were as follows:

I   DID THE TRIAL COURT ABUSE ITS DISCRETION AND DENY MR. THURMOND HIS DUE PROCESS RIGHT TO A FULL AND FAIR HEARING WHERE THE COURT FAILED TO REVIEW MR. THURMOND'S CLAIM OF NEWLY DISCOVERED EVIDENCE, AND INSTEAD, SUMMARILY DISMISSED HIS 6.500 MOTION?

II.   DOES DUE PROCESS REQUIRE A NEW TRIAL OR AT LEAST AN EVIDENTIARY HEARING WHERE, AFTER MR. THURMOND'S APPEAL, NEW INFORMATION AROSE WHICH AFFECTS THE VALIDITY OF MR. THURMOND'S BENCH TRIAL AND JURY WAIVER?

    A.   IS MR. THURMOND ALSO ENTITLED TO RELIEF FROM JUDGMENT WHERE THE IRREGULARITY WAS SO OFFENSIVE TO THE MAINTENANCE OF A SOUND JUDICIAL SYSTEM.

III.    DID THE JUDGE'S SENTENCING DEPARTURE IN MR. THURMOND'S CASE
        VIOLATE HIS DUE PROCESS RIGHTS UNDER, *Blakely v. Washington,* 542 US
        __, 124 S Ct 2531 (2004)?

(Application for Leave to Appeal at viii, Questions Presented).  On February 3, 2006, the Michigan

Court of Appeals entered its order denying petitioner's application for leave to appeal because he

failed to meet his burden of establishing entitlement to relief under MCR 6.508(D).  (2/3/06 Order,

docket # 38).  Petitioner did not seek leave to appeal to the Michigan Supreme Court.  (docket # 39).

On August 14, 2006, petitioner filed his petition seeking federal habeas corpus relief.

The petition raises the first two issues presented on direct appeal, as well as all those asserted in post-

judgment proceedings.

## **Applicable Standards**

Because petitioner filed his habeas application long after the April 1996 enactment

of the Antiterrorism and Effective Death Penalty Act, Pub. L. 104-132, 110 Stat. 1214 ("AEDPA"),

the provisions of that law govern the scope of the court's review. *See Penry v. Johnson*, 532 U.S.

782, 791 (2001); *Wilson v. Parker*, 515 F.3d 682, 691 (6th Cir. 2008).  The AEDPA has "drastically

changed" the nature of habeas review.  *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).

AEDPA "dictates a highly deferential standard for evaluating state-court rulings which demands that

state court decisions be given the benefit of the doubt."  *Bell v. Cone*, 543 U.S. 447, 455 (2005)

(citations omitted); *see Wilkins v. Timmerman-Cooper*, 512 F.3d 768, 774 (6th Cir. 2008).  "AEDPA

requires heightened respect for state court factual and legal determinations." *Lundgren v. Mitchell*,

440 F.3d 754, 762 (6th Cir. 2006).  If a state court adjudicated the claim, deferential AEDPA

standards must be applied.  28 U.S.C. § 2254(d); *see Waddington v. Sarausad*, 129 S. Ct. 823, 831

(2009). *De novo* review is restricted to instances where the state court did not address the merits of a claim. In that limited set of circumstances, "there are simply no results, let alone reasoning, to which [the habeas] court can defer." *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003); *see also Wiggins v. Smith*, 539 U.S. 510, 534 (2003); *Van v. Jones*, 475 F.3d 292, 293 (6th Cir. 2007); *Maples v. Stegall*, 427 F.3d 1020, 1025 (6th Cir. 2005).

The AEDPA prevents federal habeas "retrials" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). Section 2254(d) states that an application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "Section 2254(d)(1)'s 'contrary to' and 'unreasonable application' clauses have independent meaning. A federal habeas court may issue the writ under the 'contrary to' clause if the state court applies a rule different from the governing law set forth in [Supreme Court] cases, or if it decides a case differently than the [Supreme Court] on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. at 694 (citations omitted). A federal court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from Supreme Court decisions, but unreasonably applies it to the facts of the particular case, or if the state court unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend that principle

to a new context where it should apply. *Williams v. Taylor*, 529 U.S. 362, 407 (2000); *see Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

"It is important to note, however, that 'an *unreasonable* application of federal law is different from an *incorrect* or *erroneous* application of federal law.'" *Harbison v. Bell*, 408 F.3d 823, 829 (6th Cir. 2005)(quoting *Williams*, 529 U.S. at 409); *Waddington*, 129 S. Ct. at 831; *Fleming v. Metrish*, No. 07-2311, __ F.3d __, 2009 WL 454601, at * 3 (6th Cir. Feb. 25, 2009).  A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *see Walls v. Kontech*, 490 F.3d 432, 436 (6th Cir. 2007).  Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable."  *Williams*, 529 U.S. at 410; *see Bell v. Cone*, 535 U.S. at 694; *Keith v. Mitchell*, 455 F.3d 662, 669 (6th Cir. 2006) ("The proper inquiry under the 'unreasonable application' analysis is whether the state court decision was objectively unreasonable and not simply erroneous or incorrect."), *cert. denied*, 549 U.S. 1308 (2007); *Payne v. Bell*, 418 F.3d 644, 653 (6th Cir. 2005) ("A state court decision involves an 'unreasonable application' of clearly established Supreme Court precedent when it correctly identifies the governing legal standard but applies it to the facts before it in an objectively unreasonable manner.") (citations omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d).  This court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. at 412; *Wilson v. Parker*, 515 F.3d at 691; *Ross v. Petro*, 515 F.3d 653, 660 (6th Cir. 2008), *cert. denied*, 129 S. Ct. 906 (2009).  This

-17-

court may not consider decisions of lower federal courts in determining whether the state decision is contrary to, or an unreasonable application of, clearly established federal law. *See Williams*, 529 U.S. at 381 ("If this Court has not broken sufficient legal ground to establish an asked for constitutional principle, the lower federal courts cannot themselves establish such a principle with clarity sufficient to satisfy the AEDPA bar."); *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).

The AEDPA standard includes an important temporal limitation. "'[C]learly established Federal law as determined by the Supreme Court of the United States,' refers to 'the holdings, as opposed to the *dicta*, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'" *Dennis v. Mitchell*, 354 F.3d 511, 517 (6th Cir. 2003) (quoting *Williams*, 529 U.S. at 412); *see Fautenberry v. Mitchell*, 515 F.3d 614, 623 (6th Cir.), *cert. denied*, 129 S. Ct. 412 (2008). Thus, the inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001); *see Miller v. Webb*, 385 F.3d 666, 672 (6th Cir. 2004) (describing the issue of whether the law was clearly established by Supreme Court precedent as a "threshold inquiry"). "'Federal Courts are not free to presume that a state court did not comply with constitutional dictates on the basis of nothing more than a lack of citation.'" *Payne*, 418 F.3d at 656 (quoting *Cone v. Bell*, 543 U.S. at 455). "The state court decision need not cite Supreme Court precedent, or even reflect awareness of Supreme Court cases, 'so long as neither the reasoning nor the result of the state court decision contradicts them.'" *Dennis*, 354 F.3d at 517-18 (quoting *Early v. Packer*, 537 U.S. 3, 8 (2002)).

Regardless of the subsection of 2254(d) relied on by the petitioner, AEDPA requires heightened respect for state factual findings. 28 U.S.C. § 2254(e)(1); *see Herbert v. Billy*, 160 F.3d

1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to

be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing

evidence 28 U.S.C. § 2254(e)(1); *Owens v. Guida*, 549 F.3d 399, 404 (6th Cir. 2008); *Ivory v.

Jackson*, 509 F.3d 284, 291 (6th Cir. 2007), *cert. denied*, 128 S. Ct. 1897 (2008). This presumption

of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner

v. Mata*, 449 U.S. 539, 546 (1981); *Tucker v. Palmer*, 541 F.3d 652, 665 (6th Cir. 2008).

<u>Discussion</u>

I.    **Sufficiency of the Evidence to Support Petitioner's Conviction for First-Degree Criminal Sexual Conduct**

        Petitioner argues that the evidence was insufficient to support his first-degree criminal

sexual conduct. Under *Jackson v. Virginia,* 443 U.S. 307 (1979), a habeas petitioner challenging

a state court conviction "is entitled to habeas corpus relief if it is found that upon the record evidence

adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable

doubt." 443 U.S. at 324. In examining the sufficiency of the evidence to support a state conviction,

this Court must give deference to the fact-finder's determination, recognizing "the responsibility of

the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw

reasonable inferences from basic facts to ultimate facts." *Id.* at 319. The evidence must be viewed

in the light most favorable to the prosecution. *Scott v. Elo*, 302 F.3d 598, 602 (6th Cir. 2002). This

standard applies whether the evidence of guilt was direct or circumstantial. *Id.* The state need not

rule out every hypothesis except guilt, nor need the habeas court be persuaded of guilt beyond a

reasonable doubt. *See O'Hara v. Brigano*, 499 F.3d 492, 499-500 (6th Cir. 2007); *Walker v. Russell*,

57 F.3d 472, 475 (6th Cir. 1995).

The Due Process Clause of the Fourteenth Amendment requires that the prosecution prove "all elements of the offense charged, and must persuade the fact finder 'beyond a reasonable doubt' of the facts necessary to establish each of those elements." *Sullivan v. Louisiana,* 508 U.S. 275, 277-78 (1993) (internal citations omitted). Therefore, in reviewing the sufficiency of the evidence to support a jury's verdict, this court must "do so 'with explicit reference to the substantive elements of the criminal offense as defined by state law.' " *Parker v. Renico,* 506 F.3d 444, 448 (6th Cir. 2007) (quoting *Jackson,* 443 U.S. at 324 n.16.).

The Michigan Court of Appeals ruled directly on this claim, which petitioner's appointed counsel raised on appeal. Review of this issue must therefore be conducted under the AEDPA standard, which the Sixth Circuit has recently described as "very deferential." *Durr v. Mitchell*, 487 F.3d 423, 448 (6th Cir. 2007). Review of challenges to the sufficiency of the evidence under this standard proceeds under the "unreasonable application" prong of the statute. *See Saxton v. Sheets*, 547 F.3d 597, 602 (6th Cir. 2008); *Thompson v. Bock*, 215 F. App'x 431, 435 (6th Cir. 2007). In other words, such an argument is properly understood as an allegation that the state court's decision resulted in an unreasonable application of the standard of *Jackson v. Virginia*. *See Eady v. Morgan*, 515 F.3d 587 (6th Cir. 2008); *Riley v. Berghuis*, 481 F.3d 315, 320-21 (6th Cir. 2007). Review in such cases "is limited to determining whether the evidence was so overwhelmingly in favor of the petitioner that it compelled a verdict in his or her favor." *Thompson*, 215 F. App'x at 436. This standard presents a "very difficult hurdle" for the habeas petitioner. *Id.* at 437.

Petitioner was convicted of first-degree criminal sexual conduct, MICH. COMP. LAWS § 750.520b(1). In relevant part, that statute provides as follows:

(1)     A person is guilty of criminal sexual conduct in the first degree of he or she engages in sexual penetration with another person and if any of the following circumstances exists:

\* \* \* \*

(e)     The actor is armed with a weapon or any article used or fashion in a manner to lead the victim to reasonably believe it to be a weapon.

(f)     The actor causes personal injury to the victim and force or coercion is used to accomplish sexual penetration.

MICH. COMP. LAWS § 750.520b(1)(e), (f).  The same statute provides that "force or coercion" includes the actual application of physical force or violence as well as a credible threat of violence.

The definitional section of the criminal sexual conduct law defines "sexual penetration" as

sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of another person's body, but emission of semen is not required.

MICH. COMP. LAWS § 750.520a(r).  An act of criminal sexual conduct in the first degree is committed when there is an intrusion into the genital or anal opening of another person under one of the enumerated circumstances, regardless of the sexual purpose of the act.  *People v. Garrow*, 298 N.W.2d 627, 629 (Mich. Ct. App. 1980).  The testimony of the complaining witness alone, if believed by the trier of fact, is sufficient to sustain a conviction.  *People v. Rojem*, 297 N.W.2d 698, 699-700 (Mich. Ct. App. 1980).  This is in accordance with the federal standard.  *See Tucker v. Palmer*, 541 F.3d 652, 658 (6th Cir. 2008) (testimony of the victim alone is constitutionally sufficient to uphold conviction); *O'Hara v. Brigano*, 499 F.3d 492, 500 (6th Cir. 2007) (victim's testimony of abduction and rape constitutionally sufficient, even in the absence of corroboration or physical evidence); *accord Malcum v. Burt*, 276 F. Supp. 2d 664, 686 (E.D. Mich. 2003).

-21-

The testimony of the victim, Shannon Lemon, was more than sufficient to establish the elements of first-degree criminal sexual conduct beyond a reasonable doubt. The victim testified that in the middle of a brutal beating, petitioner committed a forcible anal rape. At the time he did so, he was in possession of a loaded firearm. Her testimony concerning the beating was corroborated by the testimony of relatives, police officers, and a doctor, all of whom observed her bruises and burn marks within twenty-four hours of the incident. The trial judge found sufficient evidence to establish penetration while the actor was armed with a dangerous weapon. MICH. COMP. LAWS § 750.520d(1)(e), as well as the alternative theory of sexual penetration involving personal injury accomplished by force or coercion. *Id.* § 750.520d(1)(f). (Bench Op. at 11, docket # 32).

Petitioner's brief (docket # 2 at 13-17) presents the same argument reviewed and rejected by the state Court of Appeals. Petitioner asserts that the finding of guilt is undermined by the testimony of Dr. Broadbent that the victim never reported a sexual assault to him, the testimony of Sgt. Clawson that the victim reported a sexual assault only during the second interview, and the testimony of forensic scientist Moore that there was no skin or tissue residue on the grate used to torture the victim. These arguments were adequately addressed by the both the trial court findings and the decision of the Court of Appeals. Both courts found that the victim's hesitancy in reporting the sexual assault was understandable in the circumstances, especially because of the painful burn wounds which would have been "uppermost" in her mind. Petitioner's arguments are no more than challenges to the credibility of the victim. Attacks on witness credibility are challenges to the quality of the prosecution's evidence, and not to the sufficiency of the evidence. *See Tyler v. Mitchell*, 416 F.3d 500, 505 (6th Cir. 2005); *Martin v. Mitchell*, 280 F.3d 594, 618 (6th Cir. 2002). An assessment of the credibility of witnesses is generally beyond the scope of federal habeas review of sufficiency

-22-

of the evidence.  *Tucker v. Palmer*, 541 F.3d 652, 661 (6th Cir. 2008).  The mere existence of sufficient evidence to convict, therefore, defeats a petitioner's claim.  *Tyler*, 416 F.3d at 504-05.  This is because questions of credibility are reserved for the trier of fact.  *See Herrera v. Collins*, 506 U.S. 390, 401 (1993).  In examining a claim of insufficiency of the evidence in habeas corpus, a federal court must presume that the trier of fact's findings in evaluating the credibility of the witnesses were correct and may ignore the testimony only when it finds it to be "inherently incredible."  *Malcum*, 276 F. Supp. 2d at 686.  Such a finding may be made only where the testimony is "unbelievable on its face," that is, testimony as to facts that the witness physically could not possibly have observed or events that could not have occurred under the laws of nature.  *Id.*  Mere inconsistencies, however, do not render a witness's testimony to be inherently incredible.  Under this standard, petitioner's arguments concerning perceived inconsistencies in the victim's testimony were matters to be weighed by the trier of fact and cannot possibly support a habeas corpus claim.[3]  The trial court's finding that petitioner was guilty of first-degree criminal sexual conduct is amply supported by evidence of the commission of the crime beyond a reasonable doubt.  This court therefore cannot say that the decision of the Michigan courts on this issue was an unreasonable application of *Jackson v. Virginia*.  Petitioner's first claim for relief must therefore be denied.

---

[3] Petitioner's argument that he is somehow exonerated by the lack of trace evidence on the grates is frivolous.  The forensic examiner testified that trace evidence of a burn would not necessarily be left on the grates in the circumstances of this case.  (TT II, 262-65).

## II.     Sentencing Error

Petitioner's second claim is that the trial court violated state law by departing from the sentencing guideline range without a "substantial and compelling reason," as required by Mich. Comp. Laws § 769.34(3).  (Petitioner's Brief at 18-22).

A central tenet of habeas corpus jurisprudence is that habeas relief is available only on the ground that a petitioner is being held in custody in violation of the federal Constitution or laws.  28 U.S.C. § 2254(a).  A habeas court cannot release a state prisoner on the ground that the conviction or sentence violates state law.  *See Estelle v. McGuire*, 502 U.S. 62, 67 (1991).  The Michigan sentencing guidelines are designed to guide the exercise of trial-court discretion in the setting of a minimum sentence.  MICH. COMP. LAWS § 769.34.  The trial judge may depart from the recommended guideline range, as long as the judge articulates "substantial and compelling" reasons for the departure.  A Michigan judge's decision to depart from the guidelines is a pure issue of state law and does not raise a federal question.  *See Tironi v. Birkett*, 252 F. App'x 724 (6th Cir. 2007); *Howard v. White*, 76 F. App'x 52, 53 (6th Cir. 2003); *Austin v. Jackson,* 213 F.3d 298, 301 (6th Cir. 2000); *Whitfield v. Martin*, 157 F. Supp. 2d 758, 762 (E.D. Mich. 2001); *Thomas v. Foltz*, 654 F. Supp. 105, 107 (E.D. Mich. 1987).  The state sentencing judge's adherence or nonadherence to the guideline range is therefore a matter without constitutional significance.

## III.     Post-Conviction Claims

The remaining five claims in the petition were raised for the first time in petitioner's motion for post-conviction relief under Mich. Ct. R. 6.500.  Although petitioner lists five claims, they boil down to three:  (a) the trial judge's undisclosed alcoholism deprived petitioner of a fair

tribunal and undermined the voluntariness of his waiver of a jury trial; (b) the state trial court and Court of Appeals erred in summarily dismissing the foregoing claim and failing to grant an evidentiary hearing; and (c) the trial court's decision to depart upwards from the state sentencing guidelines violated petitioner's Sixth Amendment rights under *Blakely v. Washington*, 542 U.S. 296 (2004).

Respondent asserts that each of these claims is procedurally defaulted, a contention clearly supported by the record.  Although petitioner presented these claims to the state trial court and Court of Appeals, he failed to present them to the state Supreme Court.  A habeas corpus petitioner is required to exhaust all available state remedies.  28 U.S.C. § 2254(b)(1)(A).  To fulfill the exhaustion requirement, a petitioner must have fairly presented his federal claim to all levels of state appellate review, including the state's highest court.  *Duncan v. Henry*, 513 U.S. 364, 365-66 (1995); *Silverburg v. Evitts*, 993 F.2d 124, 126 (6th Cir. 1993).  Petitioner in the present case has plainly failed to satisfy this requirement.   In Michigan, the exclusive method of challenging a conviction after direct review is by motion for post-conviction relief under Mich. Ct. R. 6.500-.509. *See People v. Jackson*, 633 N.W.2d 825, 829-30 (Mich. 2001); *People v. McSwain*, 676 N.W.2d 236, 248 (Mich. Ct. App. 2004).  A Michigan defendant, however, is limited to a single motion for post-conviction relief.  MICH. CT. R. 6.502(G)(1).  Petitioner is therefore precluded from bringing a successive motion for post-conviction relief in the state courts and has no available method for presenting his claims to the state's highest court.

Petitioner's failure to present his claims to the state's highest court would ordinarily constitute a procedural default which, if unexcused, would preclude further federal review in a habeas corpus action.  *See Bousley v. United States*, 523 U.S. 614, 622 (1998).  The analysis of

-25-

procedural default, however, is complicated.  For this reason, both the Supreme Court and the Sixth Circuit have held that federal courts are not required to address a procedural-default defense before deciding against the petitioner on the merits.  *See Lambrix v. Singletary*, 520 U.S. 518, 525 (1997); *Mahdi v. Bagley*, 522 F.3d 631, 635 (6th Cir. 2008); *Hudson v. Jones*, 351 F.3d 212, 215-16 (6th Cir. 2003).   Where, as here, the purportedly defaulted claims are clearly meritless, the foregoing authorities allow the court to dispose of such claims on their merits without addressing the procedural default defense.

A.     Challenge to Competency of Trial Judge

Claim 4 of the habeas corpus petition alleges a due-process violation arising from "new information" affecting the validity of petitioner's bench trial and jury waiver.  Specifically, petitioner asserts that the findings of the state JTC and Supreme Court concerning Judge Noecker's history of alcoholism, made in disciplinary proceedings instituted in 2003 and concluded in 2005, undermine both the validity of petitioner's bench trial and his decision to waive a jury in the year 2000.  Petitioner's contentions do not withstand scrutiny.

As an initial matter, a state prisoner seeking habeas corpus relief must ground his claim on "clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).  This provision of AEDPA requires a petitioner to base his claims on the "clearly established" holdings of the United States Supreme Court.  *Carey v. Musladin*, 549 U.S. 70, 74 (2006).  If the Supreme Court has not broken "sufficient legal ground to establish an asked for constitutional principle, the lower federal courts cannot themselves establish such a principle with clarity sufficient to satisfy the AEDPA bar."  *Williams v. Taylor*, 529 U.S. at 381; *Walls v. Konteh*,

490 F.3d 432, 436 (6th Cir. 2007).  The United States Supreme Court has established a due-process requirement that a judge possess neither actual nor apparent bias in a criminal case.  *See In re Murchison*, 349 U.S. 133, 136-39 (1955); *Tumey v. Ohio*, 273 U.S. 510, 522-23 (1927).  In the present case, however, petitioner does not allege that Judge Noecker was biased against him or was influenced by personal knowledge of the case or some other extrajudicial source requiring recusal.  Beyond this, the Supreme Court has not established constitutional principles requiring that a judge not suffer from personal, emotional, or substance-abuse problems.  Petitioner's challenge to the trial judge's competency therefore falters on the "threshold inquiry" of whether the law was clearly established by Supreme Court precedent in petitioner's favor.  *See Miller v. Webb*, 385 F.3d 666, 672 (6th Cir. 2004).

   Furthermore, even assuming the existence of some due-process principle at work in the present case, that principle would certainly require evidence that the judge's personal problems have had some substantial impact on the fairness of a criminal defendant's trial.  The record is devoid of any such evidence.  The detailed finding of the special master certainly supports a conclusion that Judge Noecker's problems with alcohol preexisted the bench trial in the present case.  The special master was explicit in finding, however, that no evidence existed showing that the judge ever drank during the workday or had been drinking or was intoxicated while on the bench.  (Masters Report at 13).  Likewise, the state Supreme Court made no such finding.  The record in the present case indicates that Judge Noecker was alert and unusually attentive during the entire course of the bench trial.  The judge would often interrupt witnesses during the course of examination to clarify points or to summarize the witness's testimony.  (*See, e.g.,* TT I, 25-27, TT I, 81-85).  The judge was also intimately involved in deciding procedural and evidentiary issues (*see, e.g.,* TT I, 164-75), and

showed no signs of hesitancy or confusion.  Petitioner's speculation that the trial judge was "probably" under the influence of alcohol during the trial is completely unsupported.

Petitioner's assertion that the judge's undisclosed alcoholism somehow undermined the voluntariness of the jury waiver is also unsupportable.  The case began as a jury trial, with an extensive *voir dire* proceeding consuming sixty-three pages of transcript.  (JST, docket # 29).  The judge actively conducted the *voir dire* process, personally questioning all members of the venire on their background, understanding of the concept of reasonable doubt, and other relevant topics. Significantly, the court conducted *voir dire* itself and did not call upon counsel to any significant degree.  Furthermore, the court delivered cogent instructions to the venire both before and after the *voir dire* process.

During the court's handling of objections to the venire, petitioner volunteered out of turn that he probably would have done "better coming in front of you."  (JST, 55).  The judge pursued the issue with petitioner, who said that this was not the first time he considered waiving a jury. (JST, 56-57).  Presumably, petitioner raised the issue after watching the judge in action during *voir dire*.  It is inconceivable that petitioner would have volunteered to waive a jury had the judge shown any signs of confusion, lethargy, or intoxication.  The court then carefully explained to petitioner his "absolute right" to a jury trial, and petitioner responded that he understood.  (JST, 57-58).  Petitioner then asked the judge, "What would you think would be the best for me?"  (JST, 58). The judge responded that he could not answer that or give petitioner advice, but that counsel would be in the best position to do so.  He then directed petitioner and his counsel to talk privately and assured him that he did not have to make a decision that morning.  (JST, 58-59).  Again, it is inconceivable that petitioner would have asked the court's advice if the judge displayed any

symptoms of intoxication.  After a recess, during which defense counsel discussed "the relative advantages and disadvantages of a bench trial and a jury trial" with petitioner, petitioner persisted in his desire to waive a jury.  (JST, 60).  The court continued the colloquy for a significant time, to make absolutely sure that petitioner understood all the ramifications of his decision.  (JST, 60-63).

A criminal defendant may waive the constitutional right to a jury if he does so voluntarily, knowingly, and intelligently.  *See Singer v. United States*, 380 U.S. 24, 34-36 (1965).  The burden of showing that a waiver was invalid lies with petitioner.  *Adams v. United States ex rel. McCann*, 317 U.S. 269, 281 (1942).  For a waiver to be voluntary, knowing and intelligent, the defendant must possess a minimum amount of knowledge concerning his jury trial right and the mental capacity to understand the implications of waiver of that right.  *Fitzgerald v. Withrow*, 292 F.3d 500, 504 (6th Cir. 2002); *see Sowell v. Bradshaw*, 372 F.3d 821, 832 (6th Cir. 2004).  A colloquy on the record before a jury waiver is not, however, constitutionally required.  *Sowell*, 372 F.3d at 832.  Nor is any particular form of waiver.  *Id.*  The careful and extended colloquy between the trial judge and petitioner went beyond what the Constitution requires.  This on-the-record colloquy, coupled with a recess to allow petitioner additional time to consult with counsel, is more than adequate to show that petitioner's waiver was knowing and voluntary.  *See Dickerson v. Bagley*, 453 F.3d 690, 700 (6th Cir. 2006).  The Supreme Court has never held that a discussion of the trial judge's personal flaws and faults is necessary to a knowing and voluntary waiver of a jury trial.  The dispositive inquiry is whether the defendant "understood that the choice confronting him was, on the one hand, to be judged by a group of people from the community, and on the other hand, to have his guilt or innocence determined by a judge."  *Jells v. Mitchell*, 538 F.3d 478, 510 (6th Cir. 2008)

(quoting *Sowell*, 372 F.3d at 836).  The record is more than sufficient to establish that proposition, and petitioner has failed to rebut the presumption of voluntariness.

Petitioner's due-process claim arising from the trial judge's alleged alcohol problems is both unsupported by clear holdings of the United States Supreme Court and by the factual record in this case.  It therefore must be rejected on the merits.

### B.    Challenges to Post-Conviction Procedure

Claims 3, 5, and 7 challenge the adequacy of the procedures followed by the state courts in response to petitioner's motion for post-conviction relief.  Claim 3 alleges that the trial court abused its discretion and violated petitioner's due-process rights when it failed to review petitioner's claim of newly discovered evidence and summarily dismissed the motion for post-conviction relief without a hearing.  Claim 5 asserts that this irregularity was offensive to the maintenance of a sound judicial system, and claim 7 alleges that the Michigan Court of Appeals erred in failing to remand petitioner's case for an evidentiary hearing in post-conviction proceedings.  None of these assertions states a claim for habeas corpus relief.

States are not constitutionally required to provide post-conviction process after the first appeal of right.  Allegations of errors in state post-conviction proceedings therefore cannot form the basis for habeas corpus relief.  The Sixth Circuit has recently summarized the rule as follows:

> As the district court noted, the Sixth Circuit has consistently held that errors in post-conviction proceedings are outside the scope of federal habeas corpus review. *See Kirby v. Dutton*, 794 F.2d 245, 246-47 (6th Cir. 1986); *Roe v. Baker*, 316 F.3d 557, 571 (6th Cir. 2002).  We have clearly held that claims challenging state collateral post-conviction proceedings "cannot be brought under the federal habeas corpus provision, 28 U.S.C. § 2254," because "'the essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and . . . the traditional function of the writ is to secure release from illegal custody.'" *Kirby*, 794 F.2d at

-30-

246 (quoting *Preiser v. Rodriguez*, 411 U.S. 475, 484, 93 S. Ct. 1827, 36 L.Ed.2d 439 (1973)); *see also Pennsylvania v. Finley*, 481 U.S. 551, 557, 107 S. Ct. 1990, 95 L.Ed.2d 539 (1987) ("States have no obligation to provide this avenue of relief, and when they do, the fundamental fairness mandated by the Due Process Clause does not require that the State supply a lawyer as well." (citation omitted)).  A due process claim related to collateral post-conviction proceedings, even if resolved in a petitioner's favor, would not "result [in] . . . release or a reduction in . . . time to be served or in any other way affect his detention because we would not be reviewing any matter directly pertaining to his detention." *Kirby*, 794 F.2d at 247, "Though the *ultimate* goal in" a case alleging post-conviction error "is release from confinement, the result of habeas review of the specific issue [] . . . is not in any way related to the confinement." *Id.* at 248.  Accordingly, we have held repeatedly that "the scope of the writ [does not] reach this second tier of complaints about deficiencies in state post-conviction proceedings," noting that "the writ is not the proper means" to challenge "collateral matters" as opposed to "the underlying state conviction giving rise to the prisoner's incarceration." *Id.* at 248, 247; *see also Alley v. Bell*, 307 F.3d 380, 387 (6th Cir. 2002) ("error committed during state post-conviction proceedings can not [sic] provide a basis for federal habeas relief" (citing *Kirby*, 794 F.2d at 247)); *Greer v. Mitchell*, 264 F.3d 663, 681 (6th Cir. 2001) ("habeas corpus cannot be used to mount challenges to a state's scheme of post-conviction relief").

*Cress v. Palmer*, 484 F.3d 844, 853 (6th Cir. 2007).  Under this clear Sixth Circuit authority, petitioner's complaints about the adequacy of the post-conviction process afforded him in the state trial and appellate courts fails to state a claim for habeas corpus relief.

### C.   Challenge to Sentence

Finally, petitioner's post-conviction motion attempted to raise the challenge to his sentence under *Blakely v. Washington*, 542 U.S. 296 (2004).  Specifically, the motion alleged that the trial judge's decision to depart upwards from the state sentencing guidelines was a violation of the principles enunciated by the Supreme Court in *Blakely*.  This argument lacks merit.

*Blakely v. Washington* involved the State of Washington's determinate sentencing system, which allowed a trial judge to elevate the maximum sentence permitted by law on the basis of facts not found by the jury.  Applying the Washington mandatory sentencing guidelines, the state

judge found facts that increased the maximum sentence faced by the defendant. The United States Supreme Court held that this scheme offended the Sixth Amendment, because any fact that increases or enhances a penalty for the crime beyond the prescribed statutory maximum (except facts involving a defendant's criminal record) must be submitted to the jury and proven beyond a reasonable doubt. *Blakely*, 542 U.S. at 301 (citing *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000)). Petitioner's Sixth Amendment claim under *Blakely* is without merit.[4]   Unlike the State of Washington's determinate sentencing system, the State of Michigan has an indeterminate sentencing system in which the defendant is given a sentence with a minimum and a maximum term. The maximum term is not determined by the trial judge, but is set by law. *See People v. Drohan*, 715 N.W.2d 778, 789 (Mich. 2006) (citing MICH. COMP. LAWS § 769.8). The sentencing judge establishes only the minimum sentence, guided by the applicable sentencing guideline range. *Id.*; *see also People v. Babcock*, 666 N.W.2d 231, 237 n.7 (Mich. 2003) (citing MICH. COMP. LAWS § 769.34(2)). Therefore, under Michigan law, the trial judge sets the minimum sentence (within a certain range) but can never exceed the maximum sentence. *See People v. McCuller*, 739 N.W.2d 563, 571-73 (Mich. 2007), *cert. denied,* 128 S. Ct. 1871 (2008). The *Blakely* Court itself expressly recognized that an indeterminate sentencing scheme does not infringe on the province of the jury, because the maximum sentence is fixed by law and not by judicial fact-finding. *Blakely*, 542 U.S. at 308-09. Likewise, in its recent decision in *Cunningham v. California*, 549 U.S. 270, 276-77 (2007), the Supreme Court distinguished between the former indeterminate sentencing system employed in California and the determinate system found to be in violation of the Sixth Amendment. The Sixth

---

[4] Additionally, petitioner waived a jury trial, so the present case is particularly unsuitable for application of *Blakely*.

Circuit has held that *Blakely* does not apply to Michigan's indeterminate sentencing scheme.  *See Tironi v. Birkett*, 252 F. App'x 724 (6th Cir. 2007) ("Tironi's sentence does not violate *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531, 159 L.Ed.2d 403 (2004) because *Blakely* does not apply to Michigan's indeterminate sentencing scheme."), *cert denied*, 128 S. Ct. 1898 (2008); *accord Lipsey v. Bell*, No. 1:08-cv-60, 2008 WL 1836953, at * 4 (W.D. Mich. April 22, 2008) (collecting cases); *People v. Harper*, 739 N.W.2d 523, 530-533 (Mich. 2007).

## **Recommended Disposition**

For the foregoing reasons, I recommend that all claims in the habeas petition be denied on their merits.

Dated:   March 12, 2009                     /s/  Joseph G. Scoville
                                            United States Magistrate Judge

## **NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within ten days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. MICH. LCIVR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Neuman v. Rivers*, 125 F.3d 315, 322-23 (6th Cir.), *cert. denied*, 522 U.S. 1030 (1997); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).